UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DCCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                       │
│ DATE FILED: Jan. 12, 2017            │
└─────────────────────────────────────┘
```

United States of America,

—v—

Anthony R. Murgio, et al.,

Defendants.

15-cr-769 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Defendants Yuri Lebedev ("Lebedev") and Trevon Gross ("Gross") are charged in a nine-count superseding indictment ("the Indictment" or "S3 Indictment"). *United States v. Murgio*, No. 15-CR-769 (AJN) (S.D.N.Y. Apr. 21, 2016) ("S3 Indictment"), Dkt. No. 87.[1] The charges in the Indictment stem from Anthony Murgio's alleged operation, with Lebedev's assistance, of Coin.mx, a website that the Government characterizes as an unlawful Bitcoin exchange, as well as from an alleged plan to bribe Gross, the chairman of the board of a federal credit union, in order to obscure the illegal nature of that exchange. *Id.* ¶¶ 1–10. The Court assumes familiarity with its September 19, 2016 Order resolving a number of pre-trial motions, and recounts only those facts necessary to explain each disposition. *See* Dkt. No. 198 (hereafter "Sept. 19, 2016 Order").

Before the Court are various pre-trial motions brought by the Government and the Defendants, which the Court addresses in three groupings.

---

[1] Co-defendant Michael Murgio pled guilty pursuant to a superseding information on October 27, 2016. *See* Dkt. No. 303; minute entry for Oct. 27, 2016. Co-defendant Anthony Murgio pled guilty pursuant to a superseding indictment on January 9, 2017. Dkt. No. 308; minute entry for Jan. 9, 2017.

Additionally, on December 22, 2016 the Government filed a superseding indictment against Defendants Lebedev and Gross (as well as Anthony Murgio). *See* S6 Indictment (Dkt. No. 308). Given that the pending motions, as well as the parties' briefing, address only the S3 Indictment, that, as of the date of the publication of this Order, a motion to dismiss the S6 Indictment remains pending, *see* Dkt. No. 317, and that the Defendants have not yet been arraigned on that indictment, the Court treats the S3 Indictment as operative for purposes of this Order.

1

First, the Government moves to admit certain testimony and records of the National Credit Union Association ("NCUA") relating to the examination, conservatorship, and liquidation of Helping Other People Excel Federal Credit Union ("HOPE FCU"). Dkt. No. 191 at 1. Gross both opposes the Government's motion, Dkt. No. 201 at 1, and, independently, moves to preclude introduction of much of the same evidence, Dkt. No. 190 at 1–3. Gross also moves for a Rule 17 Subpoena related to these records. *See id.* at 3.

Second, Gross moves to sever his trial from that of his co-defendant, Yuri Lebedev, Dkt. No. 230, and to transfer the case against him to the District of New Jersey, Dkt. No. 197. He also moves to preclude the Government from eliciting testimony or introducing evidence referring to payments made to him as "bribes." Dkt. No. 190 at 4. Lebedev also renews his motion to sever. Dkt. No. 244.

Third, Anthony Murgio moved, prior to pleading guilty, to compel the Government to produce various categories of evidence. Dkt. No. 200. In light of Murgio's plea, the bulk of this motion is now moot. However, to the extent that Gross joins any part of the motion, *see* Dkt. No. 216 at 12, the Court addresses it.

For the reasons that follow, the Court DENIES the Government's motion to admit certain NCUA records, DENIES Gross's motions to sever and transfer and his motion to preclude evidence referring to the alleged payments as bribes, DENIES Lebedev's renewed motion to sever, and DENIES Gross's motion to compel.

The Court further notes that these evidentiary rulings are preliminary and subject to reevaluation if circumstances at trial warrant reconsideration.[2]

---

[2] Prior to Anthony Murgio's guilty plea, the Government moved to preclude him from offering evidence that he and others allegedly involved in the management of Coin.mx disclosed to government regulators and law enforcement agencies that Coin.mx was a bitcoin exchange and sought law enforcement assistance in combatting certain fraudulent conduct on the part of specific Coin.mx users. Dkt. No. 191 at 1–2. As Murgio has now pled guilty, that motion is DENIED as moot. Yuri Lebedev opposed the Government's motion to preclude Murgio from introducing certain evidence only as follows: he argued that he "should not be precluded from offering evidence of Murgio's statements to him that Coin.mx complied with applicable laws and regulations or that Murgio relied on the advice of counsel in connection with operating Coin.mx." Dkt. No. 202. The Government, though acknowledging Lebedev's position, does not appear to dispute it and has not moved to preclude Lebedev from offering such evidence at trial. *See* Dkt. No. 219 at 11 n.3. Lebedev's request, therefore, is granted.

Table of Contents

I. The Government's motion to admit, and Gross's motion to preclude, testimony and records of the NCUA ................................................................................................................................ 4

    A. Factual Background .................................................................................................................. 4

        1. The Government's theory of the case ..................................................................... 5

        2. The contested NCUA documents............................................................................ 7

    B. Discussion .............................................................................................................................. 10

        1. The NCUA records contain hearsay inadmissible for its truth against Gross ............. 11

            a. The documents are not admissible under Federal Rule of Evidence 803(8) ........... 12

            b. The NCUA documents also may not be admitted under Federal Rule of Evidence 803(6) ......................................................................................................................... 25

        2. The evaluative findings in the NCUA records are also inadmissible pursuant to Federal Rule of Evidence 403 ........................................................................................................ 33

    C. Conclusion.............................................................................................................................. 36

II. Gross's motions to transfer and sever; Gross's second motion to preclude; and Lebedev's renewed motion to sever ............................................................................................................... 36

    A. Gross's motion to sever.......................................................................................................... 37

    B. Gross's motion to preclude the Government from referring to payments made to him as bribes........................................................................................................................................... 43

    C. Gross's motion to transfer the case against him to the District of New Jersey.................. 43

    D. Lebedev's renewed motion to sever....................................................................................... 48

III. Gross's motion to compel production of NCUA materials from the Government................. 50

IV. Temporary sealing ...................................................................................................................... 51

## I. The Government's motion to admit, and Gross's motion to preclude, testimony and records of the NCUA

The Court first addresses the Government's and Gross's parallel motions seeking admission and preclusion, respectively, of a set of NCUA records.[3]  First, the Government moves to admit testimony of NCUA officials as well as specific records relating to the examination, conservatorship, and liquidation of the HOPE FCU.  *See* Gov't Motions in Limine at 1.  Second, and relatedly, Gross moves to preclude the Government from introducing "any evidence relating to the NCUA placing the [HOPE FCU] into conservatorship or liquidation, and to its 2015 investigation and findings leading up to those decisions."  Gross Motions in Limine at 1.[4]  For the reasons that follow, the Government's motion as to the testimony is denied without prejudice; the Government's motion to admit the cited documents is denied; and Gross's motion is granted to the limited degree that he seeks to preclude admission of factual findings contained in the NCUA records for their truth.[5]

## A. Factual Background

---

[3] The Court adopts the following labeling conventions for the parties' briefs addressing the admissibility of the NCUA records. "Gov't Motions in Limine" refers to the Government's memorandum of law in support of its motions in limine. Dkt. No. 191. "Gross Opp." refers to Gross's memorandum of law opposing the Government's motions in limine. Dkt. No. 203. "Gov't Reply" refers to the Government's reply brief in further support of its motions in limine. Dkt. No. 219. "Gross Sur-Reply" refers to Gross's sur-reply brief addressing these motions in limine. Dkt. No. 289. "Gov't Resp." refers to the Government's sur-sur-reply. Dkt. No. 294. "Gross Motions in Limine" refers to Gross's memorandum of law in support of his motions in limine. Dkt. No. 190. "Gov't Opp." refers to the Government's opposition brief to Gross's motions. Dkt. No. 201. "Gross Reply" refers to Gross's reply brief in further support of his motions in limine. Dkt. No. 216. Additionally, "Lebedev Opp." refers to Lebedev's memorandum of law in opposition to the Government's motions in limine. Dkt. No. 202.

[4] Anthony Murgio and Michael Murgio initially joined Gross's motion in limine to preclude introduction of NCUA documents and testimony, as well as his opposition to the Government's motion to admit such documents and testimony, Dkt. Nos. 206; 228; 231, but they have since pled guilty.

[5] Gross also moves for permission to file a Rule 17 subpoena seeking documents from the NCUA. *See* Gross Motions in Limine at 3. Additionally, Lebedev does not join Gross's motions, but does ask the Court, should it admit any of the NCUA documents against Gross, to issue a limiting instruction that the documents may not be considered against him. *See* Lebedev Opp. at 2. Both motions are denied as moot, without prejudice, in light of the Court's conclusions in this section.

### 1. The Government's theory of the case

Defendant Trevon Gross is charged, in the Indictment, with a single count of receiving corrupt payments as an officer of a financial institution, in violation of 18 U.S.C. § 215(a)(2). S3 Indictment ¶¶ 22–23.[6] The Government alleges that evidence at trial will show the following:

Up until October 2015, Gross was Chairman of the HOPE FCU, a credit union in Lakewood, New Jersey. Gov't Reply at 24. In 2014, Anthony Murgio, Lebedev, and others, in furtherance of a purported scheme to run an allegedly unlawful money transmitting business, offered Gross bribes to help them take over the Board of the HOPE FCU. Gross agreed. *See* Gov't Motions in Limine at 18–19.

After allegedly accepting $150,000 in bribes, the Government claims that Gross proceeded to take a number of steps to facilitate the takeover of HOPE FCU by Murgio and other members of the Collectables Club, the alleged front company of Coin.mx. *Id.* Gross arranged for the Board of Directors to nominate various individuals chosen by Murgio, and promised to orchestrate the resignations of remaining Board members. *See id.* at 19. He also gave Murgio control of the credit union's affairs, and in particular permitted Murgio to use the HOPE FCU to process a high volume of automated clearing house ("ACH") transactions, despite the fact that the HOPE FCU lacked sufficient capital reserves to facilitate such transactions. *Id.*

In late Summer 2014, after receiving a tip from a former NCUA employee, the NCUA began, in the Government's words, "examining [HOPE FCU] like a hawkeye." Oct. 24, 2016 Tr. at 31. Such examination consisted primarily of a series of inspections of the HOPE FCU, inspections that revealed at least two significant facts: first, that members of the Collectables Club had joined

---

[6] Section 213 prohibits "an officer ... of a financial institution" from "corruptly accept[ing] or agree[ing] to accept[] anything of value from any person[] intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215(a)(2).

the HOPE FCU's Board, despite the fact that they were ineligible for such membership under the HOPE FCU's bylaws due to their residency; and second, that the HOPE FCU was conducting a high volume of ACH transactions, despite lacking adequate capital reserves and without complying with certain regulatory controls. Gov't Motions in Limine at 19. The NCUA further discovered that Gross had withheld the fact that members of the Collectables Club had been elected to the Board from the NCUA. *Id.* at 19. These discoveries led the NCUA to alert the HOPE FCU Board, in October 2014, as to its non-compliance. Nevertheless, even aware that the Collectables Club members did not meet the residency requirements, the Board, led by Gross, voted to create an "advisory board" on which Lebedev and others could remain. *Id.* at 20. The Government alleges that Gross also discussed with Murgio, Lebedev, and other members of the Collectables Club how they might obtain a phony office in New Jersey so as to meet the necessary residency requirement to qualify for the Board. *Id.* Gross took these actions, according to the Government, in consideration for his receipt of bribes.

In March 2015, the NCUA sought and acquired a letter of understanding from the HOPE FCU, laying out the credit union's continued failure to comply with certain of the NCUA's recommendations, and outlining jointly-agreed-to reforms to solve persistent ACH problems. *Id.* at 21. In September 2015, the NCUA determined, however, that the HOPE FCU was not complying with its obligations as laid out in the letter, and issued a preliminary warning letter accordingly. *Id.* In light of continued failures to comply, the NCUA placed the HOPE FCU into conservatorship in October 2015, and on November 20, 2015, the NCUA liquidated the HOPE FCU, finding the credit union to be insolvent. *Id.* at 21-22.

In short, the Government alleges that, in return for the receipt of bribes from members of the Collectables Club, Gross breached his fiduciary duties, and that those breaches resulted in the

6

financial deterioration of the HOPE FCU. *Id.* at 25-26.  Seeking to prove this version of events, the Government moves to admit testimony and records pertaining to the NCUA's examination of the credit union.

### 2. The contested NCUA documents

The Government has not specified what NCUA testimony it seeks to introduce.  It has, however, moved to admit six records into evidence which, collectively, chronicle much of the NCUA's investigation of the HOPE FCU.  *See* Dkt. No. 191, Exs. F–K.[7]

First, the Government seeks to admit the "Document of Resolution," a "risk-focused examination report" of the HOPE FCU prepared by the NCUA for the period ending March 31, 2014, and provided to the HOPE FCU on October 27, 2014.  Dkt. No. 191, Ex. F, at 42478; Gov't Motions in Limine at 20.  The Document of Resolution notes that the NCUA is concerned "with [the HOPE FCU's] Field of Membership," and observes that members of the Collectables Club do not meet the residency requirements necessary to qualify for the Board.  *Id.* at 42483–84.  The document further includes an extensive financial history of the HOPE FCU dating back to 2011, *see id.* at 42491–50, as well as assessments by the NCUA of the HOPE FCU's level of risk across multiple subject areas, including "compliance risk," "strategic risk," "reputation risk," "credit risk," and "transaction risk," *id.* at 42484–86, and sets of "supporting facts" for each of these assessments, *id.* at 42488.  The Document of Resolution ends with "corrective action[s]"— prescriptions which the document indicates, in its preamble, "are normally negotiated" with the credit union.  *See id.* at 42480, 42487.

---

[7] The Government moved to file exhibits F, G, H, and J under seal, and on October 5, 2016, the Court granted that motion, subject to the Court potentially revisiting its determination upon resolution of the Government's motions in limine.  Dkt. No. 234.

Second, the Government seeks to admit a "Letter of Understanding and Agreement Issued by and between the [NCUA and the HOPE FCU]." Dkt. No. 191, Ex. G, at 42111 (hereafter "Letter of Understanding"). The Letter of Understanding is dated March 25, 2015, and "sets forth significant regulatory violations and unsafe and unsound practices identified by NCUA as a result of its follow-up examination of HOPEFCU (sic)" on December 31, 2014. *Id.* In particular, the letter concludes that "ACH policy and procedures are inadequate for complex transactions," finds that the HOPE FCU has committed a number of "regulatory violations," and prescribes a set of corrective actions that the HOPE FCU must take. *Id.* at 42112–15. The letter is signed by, among other members of the Board, Trevon Gross. *Id.* at 42115.

Third, the Government seeks to admit a September 23, 2015, "Preliminary Warning Letter to the Officials of [HOPE FCU]." Dkt. No. 191, Ex. H, at 42109 (hereafter "Preliminary Warning Letter"). The Preliminary Warning Letter concludes that the HOPE FCU "is operating in an unsafe and unsound manner, necessitating substantial and immediate corrective action." *Id.* It notes that "[t]he credit union has restarted ACH processing for business accounts without NCUA approval," and avers that "due diligence maintained on [HOPE FCU's] Third Party Payment Processor's customers is inadequate." *Id.* The letter also notes that the NCUA is aware of the criminal investigation into Coin.mx: "In addition, NCUA is reviewing the criminal charges and evidence related to the Collectables Club to determine what, if any, additional risks may be posed by the role of HOPE in the investigation." *Id.*

Fourth, the Government seeks to admit an "Order of Conservatorship" issued on October 15, 2015. Dkt. No. 191, Ex. I, at 52271. The order provides notice to the HOPE FCU of the NCUA's decision to take possession and control of the credit union. *Id.* The document "incorporate[s] … by reference" the summary of facts contained in the fifth exhibit, the

8

"Confidential Statement of Grounds for Conservatorship," Dkt. No. 191, Ex. J, and further states

that as "grounds for conservatorship," "the NCUA Board has determined that conservatorship is

necessary to conserve HOPE's assets, to protect the interests of its members, and to protect the

[NCUA] Share Insurance Fund." *Id.* at 52273.

Fifth, the Government seeks to admit the "Confidential Statement of Grounds for

Conservatorship." Dkt. No. 191, Ex. J, at 52264 (hereafter "Confidential Statement of

Grounds"). In the Confidential Statement of Grounds, the NCUA provides an extensive

narrative summary of its reasons for placing the HOPE FCU into conservatorship. The narrative

covers a period of time spanning over a year and lists as grounds for conservatorship many of the

facts that the Government seeks to prove at this trial, including that Gross "solicited and accepted

payments to himself and his church in exchange for relinquishing control of the credit union to

the Collectibles Club," *id.* at 52265, that the "Collectables Club [was] a sham front-

company . . . . [organized] to evade detection of [an] unlicensed Bitcoin exchange business,

Coin.mx," *id.*, that Gross "took no action to prevent the [Collectables Club] Board members

from operating the credit union in an unsafe and unsound manner by engaging in excessive,

uncontrolled ACH transactions," and that Gross took numerous actions to avoid NCUA scrutiny,

*id.* at 52265–67. The document further chronicles the "deterioration of HOPE [FCU's] financial

condition" throughout 2015, and observes that "[c]ertain of [Gross's] activities are the subject of

a criminal investigation." *Id.* at 52267. Throughout the Confidential Statement of Grounds, the

NCUA describes evidence from an administrative record, and explains how inferences from this

evidence support the NCUA's ultimate factual conclusions. *See, e.g.*, *id.* (noting, *inter alia*, that

"[e]vidence in the administrative record supporting this action demonstrates that Gross conspired

with[, among others,] Michael and Anthony Murgio" to deceive the NCUA, and providing the NCUA's "interpret[ation]" of various pieces of evidence).

Finally, the Government seeks to admit a subsequent "Order of Liquidation," issued on November 20, 2015. Dkt. No. 191, Ex. K, at 52225–27. In the order, the NCUA "finds [HOPE FCU] insolvent," as the term is defined in NCUA regulations, and involuntarily liquidates the HOPE FCU. *Id.*

## B. Discussion

As an initial matter, though the Government seeks to admit both testimony of NCUA examiners and the specific NCUA records it describes, Gross avers in his opposition that he lacks the necessary information to oppose, at this time, admission of the testimony. Gross Opp. at 1 (stating that he "does not have sufficient information at this time ... to object to the admission of testimony of NCUA examiners who made personal observations during their examinations of [HOPE] FCU in 2014, and reserves the right to make further motions when their statements are disclosed"). In light of Gross's position, the parties do not greatly debate the admissibility of the hypothetical testimony. As such, the Court denies the motion to admit the testimony at this time without prejudice to its subsequent renewal.

The Government, further, does not argue that any of the records should be admitted for any purpose other than the truth of the matters asserted. The only question presently before the Court, then, is whether the delineated records of the NCUA's examination, conservatorship, and liquidation of the HOPE FCU are admissible for their truth.[8]

---

[8] Gross initially moved, in his motions in limine, to "preclude *any evidence* relating to the NCUA placing the [HOPE FCU] into conservatorship or liquidation, and to its 2015 investigation and findings leading up to those decisions." Gross Motions in Limine at 1 (emphasis added). Despite the breadth of this request, however, Gross's reply brief in support of his motions in limine almost exclusively addresses the *specific* records the Government seeks to admit in its motions in limine. *See generally* Gross Reply. Further, Gross makes numerous representations

Gross argues that the NCUA records are not admissible for two reasons: first, that they contain inadmissible hearsay, and second that, in any event, admission would be unduly prejudicial under Federal Rule of Evidence 403. Gross Opp. at 1–11. The Government responds that the records, though hearsay, are admissible under both the public records hearsay exception, *see* Fed. R. Evid. 803(8), and the business records exception, *see* Fed. R. Evid. 803(6). It further argues that, if admissible, the records need not be excluded under Rule 403.

The Court agrees with Gross. For the reasons that follow, the Court finds that the NCUA records may not come under either Federal Rule of Evidence 803(8) or Rule 803(6). In the alternative, the Court also holds that, even if admissible under either exception, the records should be excluded pursuant to Federal Rule of Evidence 403.

### 1. The NCUA records contain hearsay inadmissible for its truth against Gross

Gross argues first that the NCUA records contain inadmissible hearsay and thus may not be admitted against him for their truth.

The Federal Rules of Evidence define hearsay "as a declarant's out-of-court statement 'offer[ed] in evidence to prove the truth of the matter asserted in the statement.'" *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (quoting Fed. R. Evid. 801(c)) (alteration in original). "Hearsay is admissible only if it falls within an enumerated exception" under the Federal Rules of Evidence. *Id*; *see also* Fed. R. Evid. 803 (including numerous such exceptions). A party seeking to show that a particular record fits into a hearsay exception bears the burden of

---

throughout the parties' parallel briefing that cast doubt on what, if anything, he seeks to preclude *outside* of the records the Government has produced. *See, e.g.*, Gross Opp. at 1 (noting that he does not oppose admission of testimony of NCUA examiners at this time); Gross Reply at 10 (indicating that "[i]t is the inferences the NCUA drew from the evidence, which were influenced by the government, that are so prejudicial to Mr. Gross, and not the evidence itself"). As such, the Court limits its determinations in this Order to the admissibility of the specific records the Government has produced.

so demonstrating. *Brown v. Keane*, 355 F.3d 82, 88 (2d Cir. 2004). Further, a single document may simultaneously include admissible and inadmissible elements. *See, e.g.*, *United States v. Rosa*, 11 F.3d 315, 332–33 (2d Cir. 1993) (noting that a district court acted properly in letting certain portions of an autopsy report in under then-Fed. R. Evid. 803(8)(B), but excluding "the factual conclusions drawn from those observations as required by Rule 803(8)(C)").

The Government does not dispute that the NCUA records contain hearsay and are being offered for their truth. It argues, however, that the records may come in under two hearsay exceptions: the public records exception, *see* Fed. R. Evid. 803(8) and, subject to qualifying testimony, the business records exception, *see* Fed. R. Evid. 803(6). *See* Gov't Motions in Limine at 27–28.

### a.  The documents are not admissible under Federal Rule of Evidence 803(8)

The Government first argues that the NCUA records are admissible under the public records exception as they contain "matter[s] observed while under a legal duty to report." Fed. R. Evid. 803(8)(A)(ii). Gross, in response, argues that the records instead contain "factual findings from a legally authorized investigation" that, pursuant to Rule 803(8)(A)(iii), may not be admitted against a defendant in a criminal trial. Gross is correct.

Under Federal Rule of Evidence 803(8), "[a] record or statement of a public office," though hearsay, is admissible "if":

> (A) it sets out:
>
> (i) the office's activities;
>
> (ii) a *matter observed while under a legal duty to report*, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>
> (iii) in a *civil case* or against the *government* in a criminal case, factual findings from a legally authorized investigation; and

12

(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8) (emphases added).[9]  As indicated by its text, Rule 803(8) draws a distinction between "matter[s] observed while under a legal duty to report," on the one hand, and "factual findings from a legally authorized investigation," on the other.  *Id.*  Per the rule, the former are admissible in a criminal case unless "observed by law-enforcement personnel"; the latter, in contrast, may not be admitted in a criminal case against a defendant.  *Id.*; *see also* Fed. R. Evid. 803 advisory committee report (1972 Proposed Rules) ("[T]he rule with respect to evaluative reports under item (c) is very specific: they are admissible only in civil cases and against the government in criminal cases in view of the almost certain collision with confrontation rights which would result from their use against the accused in a criminal case."); *Rosa*, 11 F.3d at 332–33 (noting that, in a criminal case, "[t]he district court dealt properly [in admitting an] autopsy report within [the] framework [of Rule 803(8)]" because "[i]t allowed in evidence the report's observations [under Rule 803(8)(B)], and it excluded the factual conclusions drawn from those observations as required by Rule 803(8)(C)"); *United States v. Pinto-Mejia,* 720 F.2d 248, 253, 258 (2d Cir. 1983), *opinion modified on denial of reh'g,* 728 F.2d 142 (2d Cir. 1984) (finding, in a criminal case, that a report could not be admitted against the defendant under Rule 803(8)(B) as it contained factual findings made pursuant to a legally authorized investigation); *United States v. Oates*, 560 F.2d 45, 66 (2d Cir. 1977) (noting the "general rule . . .  that hearsay evidence failing to meet the requirements of one exception may

---

[9] Rules 803(8)(A)(ii) and 803(8)(A)(iii) were formerly Rules 803(8)(B) and 803(8)(C), respectively. *United States v. Gluk*, 831 F.3d 608, 613 n.4 (5th Cir. 2016).  This Order, in citing relevant precedent, references the version of the rule applicable at the time of the cited decision.

nonetheless satisfy the standards of another," before going on to hold that, this general rule notwithstanding, the Government could not use Rule 803(8)(B) to admit evidence otherwise excluded under Rule 803(8)(C)).

The Government argues that the NCUA records contain solely "matter[s] observed while under a legal duty to report," and are thus admissible against Gross. As explained below, analysis of the text of Rule 803(8), in concert with the precedent interpreting it, instead demonstrates that, because the NCUA records contain evaluative conclusions arrived at through an investigatory process rather than objective facts directly observed and recorded by a government actor, they contain "factual findings from a legally authorized investigation," and are inadmissible under Rule 803(8) against a criminal defendant.[10]

The Court begins its analysis with the text. *See United States v. Velastegui*, 199 F.3d 590, 594 (2d Cir. 1999) (noting that, in cases of statutory interpretation, "[the Court's] analysis begins with the language of the statute"). The *Merriam Webster* dictionary defines "matters" as, *inter alia*, "the events or circumstances of a particular situation." *See Matter*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/matter (last visited, Dec. 29, 2016). It further defines "observe" as, *inter alia*, "to watch and sometimes also listen to (someone or something) carefully," "to see and notice (someone or something)," or "to make a

---

[10] Both parties agree that NCUA examiners have a legal duty to "make a full and detailed report of the condition of [a] credit union to the [NCUA] Board." 12 U.S.C. § 1784; Gov't Opp. at 2 n.1. Even if a necessary condition to admission under 803(8)(A)(ii), however, the existence of a legal duty to report is not a *sufficient* condition. *See* Rule 803(8)(A)(ii) (permitting admission of a "*matter observed* while under a legal duty to report" (emphasis added)); *Rosa*, 11 F.3d at 332–33 (letting in part of a record under Rule 803(8)(B) and affirming the exclusion of factual findings in that same record under Rule 803(8)(C)). Indeed, both Rule 803(8)(A)(ii) and Rule 803(8)(A)(iii) require some legal duty or authorization for a given record to be admissible, making evident that the existence of such a duty is not dispositive of the nature of the record. *See, e.g., United States v. Awad*, No. 06 CR 600 (DLC), 2007 WL 1988382, at *5 (S.D.N.Y. July 3, 2007) (noting that a given report by the Department of Health and Human Sources that cathinone should be added to Schedule I of the Controlled Substances Act was inadmissible as a matter observed while under a duty to report, but might be admissible under 803(8)(A)(iii), given that "HHS was required by law to provide [the] report to the [Drug Enforcement Agency ("DEA")] when the DEA requested its analysis").

comment about something you notice." *Observe*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/observe (last visited Dec. 29, 2016). Finally, it defines "report" as, *inter alia*, "to give an account of" or "to describe as being in a specified state." *Report*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/report (last visited Dec. 29, 2016). Assessing this text as a whole, Rule 803(8)(A)(ii) contemplates the admission of records recounting events or objective facts directly observed by a particular government actor. Examples might include witnessing, and describing exactly (i.e. without commentary), an induction ceremony, *United States v. Van Hook*, 284 F.2d 489, 492–94 (7th Cir. 1960), *rev'd on other grounds, Van Hook v. U.S.*, 365 U.S. 609 (1961); writing down a serial number on a weapon, *United States v. Johnson*, 722 F.2d 407, 410 (8th Cir. 1983); or recording certain facts about a body during an autopsy report, *Rosa*, 11 F.3d at 332–33; *see also* Fed. R. Evid. 803(8) advisory committee report (1972 Proposed Rules) (collecting examples).

In contrast to Rule 803(8)(A)(ii), the text of 803(8)(A)(iii) contemplates admission of records containing evaluative, rather than objective, determinations arrived at through a more elaborate (and often investigatory) process. *Merriam Webster* defines "findings" as, *inter alia*, "the result of a judicial examination or inquiry" or "the results of an investigation," *Findings*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/findings (last visited Dec. 29, 2016), and defines "investigate" as "to observe or study by close examination and systemic inquiry," "to make a systematic examination," or "*especially*[,] to conduct an official inquiry," *Investigate*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/investigate (last visited Dec. 29, 2016) (emphasis in original). The text of Rule 803(8)(A)(iii) thus sharply differs from that of 803(8)(A)(ii) in at least two ways. First,

the rule is not limited to admission of matters observed (which presumably would include observed *facts*), but instead allows admission of factual *findings*. The latter term, in contrast to the former, can encompass inferences, higher-order determinations, and ultimate conclusions arrived at from disputed evidence. *See Miller v. Caterpillar Tractor Co.*, 697 F.2d 141, 142–43 (6th Cir. 1983) (observing that, in the context of an accident report, the question "whether the light was red or green for one driver or the other at the time of the accident [was] distinctly a factual finding within the meaning of [Rule 803(8)(C)] . . . [i.e] . . . an evaluative opinion *resulting from evidence*" (quoting *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 557 (6th Cir. 1978)) (emphasis in original); *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 153 (S.D.N.Y. 2009) (observing that, under 803(8)(C), a court may admit "[o]pinions and conclusions of the agency on matters of fact that flow from … investigative findings" (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988)); *see also United States v. El-Mezain*, 664 F.3d 467, 499 (5th Cir. 2011), *rev.* (Dec. 27, 2011) (observing, though in the context of assessing whether certain documents seized from the Palestinian Authority describing the financing of Hamas could come in under the residual hearsay exception, that the documents did not lay out "the kind of objective factual matters [that the Fifth Circuit had previously] found to be reliable under Rule 803(8)(B) when reported as a matter of course"); *Miller*, 697 F.2d at 142–43 ("It is … clear from construction of the rule … that factual findings admissible under Rule 803(8)(C) may be those which are made by the preparer of the report from disputed evidence, as contrasted to those facts which are 'matters observed pursuant to duty imposed by law as to which matters there was a duty to report' called for under Rule 803(8)(B)." (quoting *Baker*, 588 F.2d at 557–58)).

Second, the text of 803(8)(A)(iii) suggests that the *procedure* through which such findings are made also differs from the procedure contemplated in Rule 803(8)(A)(ii): whereas, under

Rule 803(8)(A)(ii), an agent directly observes a particular fact, Rule 803(8)(A)(iii) suggests that *findings* of fact may arise out of a broader "investigation," one that can involve hearings, evaluation of a set of compiled documents (that may themselves include matters directly observed), and indeed, an administrative record. *See, e.g.*, *Robbins v. Whelan*, 653 F.2d 47, 50 n.5 (1st Cir. 1981) ("A public record based upon information supplied by outsiders should be viewed as investigative in nature and examined under clause (C) [of Fed. R. Evid. 803(8)]." (quoting 4 D. Louisell & C. Mueller, Federal Evidence § 455, at 729 (1980)); Fed. R. Evid. 803(8) advisory committee report (1972 Proposed Rules) (noting that "[f]actors which may be of assistance in passing upon the admissibility of evaluative reports include: (1) the timeliness of the investigation, (2) the special skill or experience of the official, (3) whether a hearing was held and the level at which conducted, [and] (4) possible motivation problems," and thus fleshing out the contours of what, precisely, an evaluative report *is* (internal citations omitted)); *cf. United States v. Garcia*, 413 F.3d 201, 212 (2d Cir. 2005) (drawing a parallel distinction between the "personal perceptions" of a testifying agent, admissible as lay opinion, and observations based on the agent's reliance on "the 'entirety' or 'totality' of information gathered in an investigation," which are not). Examples of evaluative reports might thus include a "report of [the] Bureau of Mines as to [the] cause of [a] gas tank explosion," Fed. R. Evid. 803(8) advisory committee report (1972 Proposed Rules) (describing *Moran v. Pittsburgh-Des Moines Steel Co.*, 183 F.2d 467 (3d Cir. 1950)), a certificate from the government of Venezuela concluding that the registration of a boat had expired and including "descriptions of existing records, speculation, past government actions, and legal conclusion[s]," *Pinto-Mejia*, 720 F.2d at 257, and the report of a state agency as to the merits (and factual contours) of a discrimination claim, *see Paolitto v.*

17

*John Brown E. & C., Inc.*, 151 F.3d 60, 64 (2d Cir. 1998); *see also* Fed. R. Evid. 803(8) advisory

committee reports (1972 Proposed Rules) (collecting examples).

Three cases from within this circuit further affirm, and illustrate, the distinctions between

matters observed and factual findings suggested by the text of Rule 803(8)(A). In *Rosa*, though

the Second Circuit affirmed a district court's admission of an autopsy report's "observations,"

the panel also observed that the district court "properly . . . excluded the *factual conclusions*

drawn from those observations as required by Rule 803(8)(C)." *Rosa*, 11 F.3d at 331-33

(emphasis added). The latter conclusions, excluded by the lower court, included "the author's

diagnosis and his opinions as to the manner and cause of death," conclusions that went beyond

direct recording of objective facts to include evaluations arrived at through review, inference,

and analysis. *Id.* at 331. In *United States v. Awad*, the district court found that a report could not

be admitted under then-Rule 803(8)(B) where "the authors of the Report did not [themselves]

observe" the matters they reported, but instead "surveyed relevant literature and drew

conclusions from that survey." No. 06 CR 600 (DLC), 2007 WL 1988382, at *5 (S.D.N.Y. July

3, 2007); *see also id.* (further noting that, "[s]imilarly, there [was] no basis to conclude that the

scientists and researchers whose writings were evaluated [by the authors]. . . were themselves

making observations" pursuant to a legal duty). The conclusions in question included not simply

reported factual matters, but also "recommendations" based on findings, and the authors did not

simply report what they observed, but "evaluated" other sources to reach their conclusions. *Id.*

Finally, in *Pinto-Mejia*, the district court initially admitted, pursuant to then-Rule 803(8)(B),

a certificate from a Venezuelan government official finding that the defendant's vessel no longer

had Venezuelan registration. *Pinto-Mejia*, 720 F.2d at 258. On appeal, the Second Circuit

vacated the judgment of conviction. *Id.* First, though in the context of finding that the report

could not come in under Federal Rule of Evidence 803(10), the court observed that the certificate did not simply report that the ship's registration had expired or otherwise relay specific facts, but provided a "legal conclusion." *Id.* at 257 (observing that the report speculated that "in view of the expiration of its registration, [the ship] . . . could not invoke the Venezuelan nationality to protect its status under any circumstance"). Second, the panel noted that the text of the certificate suggested that the writer had not personally observed the facts therein, but had reached such conclusions on the basis of an investigation. *See id.* at 258 (noting that "the statement that 'the Maritime Authority has found grounds for the expiration of its registration'… indicates that the Maritime Authority made an investigation resulting in its finding that grounds existed for the revocation of the registration"); *see also id.* at 257 (observing that the report contained "descriptions of existing records, speculation, past government actions, and legal conclusion"). In short, because the certificate included *findings* of fact after an investigation, rather than a recitation of objective matters directly observed by an agent, it was inadmissible under then-Rule 803(8)(B).

Analyzing the NCUA reports with these two factors in mind—the nature of the findings and the process which produced them—it is evident that, whether or not the *entirety* of any given report need be excluded as evaluative, each report includes determinations that are properly understood as factual findings from a legally authorized investigation and are thus inadmissible for their truth against Gross.

First, as Gross observes, each of the documents contains at least one, and often a myriad, of evaluative conclusions, legal conclusions, and even recommendations, all of which go well beyond simple matters observed. The Document of Resolution includes assessments of the HOPE FCU's risk levels across a number of areas as measured on an NCUA-generated scale.

19

*See, e.g.*, Document of Resolution at 42485 ("Reputation risk is assessed as '*High*' due to the possibility of ineligible members discussed in the Compliance section of this report"). It includes speculation that cannot be said to have been "observed" by the author of the report. *See, e.g., id.* ("If members become aware of [the eligibility problems], their perception of the credit union could be negatively impacted."). It includes not just recommendations, but *required actions* on the part of the HOPE FCU. *See, e.g., id.* at 42486 ("In order to eliminate adverse trends and maintain viable ongoing operations, all members of the board of directors must become actively involved by implementing immediate, specific, and sustained actions to reduce risk exposures."). And lest there was any doubt as to the nature of its findings, the document itself lists the "supporting facts" on which its numerous *evaluative* conclusions are based. *See, e.g., id.* at 42487; *see also Miller*, 697 F.2d at 142–43 (distinguishing mere evidence from an "evaluative opinion *resulting from evidence*" (quoting *Baker*, 588 F.2d at 557)).

The remaining documents also contain findings of fact inadmissible under Rule 803(8)(A) against a criminal defendant. The Letter of Understanding contains evaluative conclusions, including determinations by the NCUA that the HOPE FCU violated numerous legal regulations. *See, e.g.*, Letter of Understanding at 42111 (noting that the "[letter] sets forth significant regulatory violations and unsafe and unsound practices identified by NCUA as a result of its follow-up examination of HOPEFCU (sic) with an effective date of December 31, 2014"); *compare Pinto-Mejia*, 720 F.2d at 258 (noting that the certificate in question included a "legal conclusion").[11] The Preliminary Warning Letter states that the HOPE FCU "is operating in an

---

[11] In its reply brief, the Government argues for the first time, in footnote, that "[e]ven if the [Letter of Understanding] were not a public record or business records, it is independently admissible as an adopted statement of a party opponent, because it was 'agreed to and accepted' by Gross." Gov't Reply at 15 n.7 (quoting Letter of Understanding at 42115) (citing Fed. R. Evid. 801(d)(2)). "It is well established . . . , that a court should not 'consider arguments that are raised for the first time in a reply brief.'" *Mateo v. Bristow*, No. 12 CIV. 5052 (RJS), 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006)). The Court does not consider the Government's late-raised argument.

unsafe and unsound manner, necessitating substantial and immediate corrective action," an evaluation based on (and synthesized from) underlying facts. Preliminary Warning Letter at 42109. The Order of Conservatorship sets forth a summary of the NCUA's grounds for conservatorship, including evaluative findings based on an administrative record designed to justify *legal* action on the part of the NCUA. *See* Order of Conservatorship at 52273 (noting that "the NCUA Board has determined that conservatorship is necessary to conserve HOPE's assets, to protect the interests of its members, and to protect the National Credit Union Share Insurance Fund [the 'NCUSIF']"); *compare Rosa*, 11 F.3d at 332–33 (finding that a determination as to cause of death, in contrast to more objective matters in an autopsy report, was a factual finding). And the Order of Liquidation begins with what is clearly a legal conclusion: that "the [NCUA] Board *finds* [HOPE FCU] insolvent, *as defined* in 12 C.F.R. § 700.2(1))." Order of Liquidation at 52225 (emphases added).

Finally, there is no question that the Confidential Statement of Grounds is comprised of "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). The Confidential Statement includes not only legal conclusions, *see* Confidential Statement of Grounds at 52264 (finding, *inter alia*, that "[t]he NCUA Board has determined that conservatorship is necessary in order to conserve the assets of the credit union"), but also a supporting narrative replete with factual *findings* on ultimate issues of liability based on an administrative record, *see id.* at 52265 (concluding, *inter alia*, that Gross's conduct "violates NCUA regulations," that Gross accepted bribes, and that "Collectables Club [is] a sham front-company"); *id.* at 52267 (in which the Confidential Statement of Grounds first summarizes evidence in the administrative record "supporting [the NCUA's conservatorship decision],"

---

including recordings of Gross purportedly demanding funds from the Collectables Club members, and then provides the NCUA's "interpret[ation]" of this evidence). Indeed, if the statements in this document are not factual findings, it is hard to imagine what would count as factual findings, and by extension, how one could ever distinguish Rules 803(8)(A)(ii) and (iii).

Additionally, analyzing the procedure through which the NCUA's conclusions were arrived at further confirms that the records contain factual findings inadmissible against Gross. First, the Government itself admits that the findings in the Confidential Statement of Grounds are "based upon (1) the NCUA examiners' own observations and records gathered during the course of their examinations of HOPE FCU, *and* (2) the NCUA's independent evaluation of evidence gathered in the criminal investigation, which the Government supplied to the NCUA in August 2015 and the Government anticipates will be admitted at trial." Government Resp. at 2 (emphasis added). This statement not only confirms that the NCUA's findings are not matters directly observed by the NCUA, but instead evaluations of a record including outside evidence, *see Robbins*, 653 F.2d at 50 n.5 (suggesting such records fit properly under 803(8)(C)), but also all but admits that the findings are not themselves observations made by the NCUA examiners but instead are "*based*" upon such observations. Gov't Resp. at 2 (emphasis added).

Second, several documents explicitly lay out "[g]rounds" for the NCUA's actions. *See, e.g.*, Confidential Statement of Grounds at 52264. The Second Circuit has found such language to indicate that a document conveys the results of an investigation, not merely matters directly observed. *See Pinto-Mejia*, 720 F.2d at 258 ("[T]he statement that 'the Maritime Authority has found grounds for the expiration of its registration'… indicates that the Maritime Authority made an investigation resulting in its finding that grounds existed for the revocation of the registration."). The existence of an administrative record further underscores this determination.

And finally, the records were generated through an adversarial, rather than objective, process. The Government observes, in seeking to demonstrate that the documents are *trustworthy*, that "Gross and HOPE FCU had the opportunity to submit evidence to the NCUA throughout the examination process and also had the opportunity to challenge the Order of Conservatorship in federal court, but did not do so." Gov't Reply at 22. In support of this proposition, however, the Government cites to four factors provided under the advisory committee notes to Rule 803(8) that the notes suggest may be helpful in determining whether *evaluative reports*, not observed matters, are trustworthy. *See* Gov't Reply at 21 (citing Fed. R. Evid. 803(8) advisory committee report (1972 Proposed Rules) ("Factors which may be of assistance in passing upon the admissibility of *evaluative reports* include[, *inter alia*,] . . . whether a hearing was held and the level at which conducted . . . .") (emphasis added)); *see also In re Sept. 11 Litig.*, 621 F. Supp. 2d at 154 (applying these factors to determine whether an evaluative report was trustworthy under then-Rule 803(8)(C)). The fact that Gross could challenge the findings in a formal adversarial hearing does not make them trustworthy in this context; it makes them *evaluative*.

In summary, analyzing the substance of the findings in the NCUA records, in concert with the procedure through which those findings were made, makes clear that the proffered records each contain findings of fact made pursuant to a legally authorized investigation that may not be admitted under Rule 803(8)(A)(ii) against Gross.

In support of the contrary contention, the Government cites to several cases that it purports stand for the proposition that the NCUA records contain only matters observed. None of these cases, however, supports such a position. In *Remington Inv., Inc. v. Quintero & Martinez Co.*, 961 F. Supp. 344 (D.P.R. 1997), a district court allowed in a report by the Federal Deposit Insurance Corporation under *both* 803(A)(ii) and 803(A)(iii). The report, however, consisted of

a mere summary of an insolvent bank's assets, rather than evaluative conclusions. *See id.* at 351 (noting that the report was "a *compilation of data* from 'matters observed,' namely, the business records of the Bank" (emphasis added)).  Further, the court at no point attempted to draw any distinction between matters observed and factual findings, and indeed, such distinction would be of little consequence in a civil case where factual findings *are* admissible against a defendant.

In *Norwest Bank Midland v. Shinnick*, 402 N.W.2d 818 (Minn. Ct. App. 1987), the Minnesota Court of Appeals admitted a letter from the Federal Office of the Comptroller of Currency ("OCC") concluding that the defendant was partially responsible for a bank's failure. *See id.* at 824 (admitting the report under Minnesota's version of the public records exception). However, the court, though noting that the letter could come in as a public record, did not specify whether it would come in under Minnesota Rule of Evidence 803(8)(B) or (C), and again, the question was unlikely to be raised given that the case was a civil one. *See id.*

In *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997), the court *assumed arguendo* that a particular OCC letter was admissible under Rule 803(8)(B), and then found the letter overly prejudicial for reasons not applicable in the present case. *See id.* at 430.  Similarly, in *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006), though the court admitted NCUA documents under Rule 803(6), it explicitly noted in footnote that the defendant's "claim that factual findings in public reports under Fed. R. Evid. 803(8)(C) are admissible only against the government in criminal cases appear[ed] only in his reply brief and [was] therefore waived." *Id.* at 152 n.3.

None of these cases, then, changes the Court's analysis of these documents.  Because each of the proffered NCUA records contains "factual findings from a legally authorized investigation," the records are not admissible under Rule 803(8)(A)(ii) against Gross.

24

### b. The NCUA documents also may not be admitted under Federal Rule of Evidence 803(6)

Even if the records are not admissible under Rule 803(8), the Government argues that they

may, in the alternate, be admitted under Rule 803(6) as business records. The Court disagrees.

Federal Rule of Evidence 803(6) permits admission into evidence of "business records" for

the truth of the matters asserted. *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010). Rule

803(6) permits into evidence "[a] record of an act, event, condition, opinion, or diagnosis if":

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). The rule's requirements are designed, in part, to permit admission of

records made in the regular course of business, while preventing the admission of records created

"in anticipation of any litigation" or with "motive to falsify the record in question." *Kaiser*, 609

F.3d at 574 (quoting *United States v. Freidin,* 849 F.2d 716, 719 (2d Cir. 1988)).

The Government argues that, even if the NCUA records contain findings of fact and thus

may not come in as public records, they can nevertheless come in under the business records

exception to the hearsay rule. Gov't Opp. at 3. The Government cites to *United States v.*

*Sokolow*, a Third Circuit opinion in which the court assessed whether "the limitations of Rule

803(8)(B) and (C)," and in particular the inadmissibility of factual findings in a criminal trial

against a defendant, must be "import[e]d . . . into other hearsay exceptions." 91 F.3d 396, 404

(3d Cir. 1996). The Third Circuit concluded that, because, in its view, the relevant restriction

under then-Rule 803(8)(C) stems from Confrontation Clause concerns, it follows that "Rule

803(8)(C) does not compel the exclusion of documents properly admitted under Rule 803(6)

where the author testifies." *Id.* at 405 (citing *United States v. Hayes,* 861 F.2d 1225, 1230 (10th

Cir. 1988); *United States v. King,* 613 F.2d 670, 672–73 (7th Cir. 1980)). The Government

argues that, because in this case, "the NCUA witnesses who created the records will testify and

be available for cross examination," *Sokolow* permits admission of the records under 803(6) to

the degree that they otherwise qualify for that exception. Gov't Opp. at 3. Gross, in response,

argues that Rule 803(8)(A)(iii)'s ban on the admission of evaluative reports is necessarily

imported into 803(6), and thus that "the government cannot use the business records rule to get

around the limitations in Rule 803[(8)(A)(iii)], particularly in this case where the records are not

merely factual, mechanical records generated by public agencies, but evaluative reports raising

confrontation concerns." Gross Reply at 6. Gross is correct.

As an initial matter, it is far from obvious that all of the records, and in particular the

Confidential Statement of Grounds, could properly be admitted under Rule 803(6), even were

that rule to permit admission of evaluative reports otherwise inadmissible against a criminal

defendant under Rule 803(8)(A)(iii). This is so for several reasons. First, Second Circuit

precedent suggests that many, if not all, of the records—which include factual narratives culled

from an administrative record—are of the sort not ordinarily admissible under the business

records rule. *See Abascal v. Fleckenstein*, 820 F.3d 561, 565–66 (2d Cir. 2016) (finding that a

prison-monitoring report by a private, nonprofit corporation, created on the basis of

questionnaires, interviews, and personal observations, could not be admitted as a business record,

26

in part because "[t]he creation of the Report required interpreting survey results and inmate interviews and then creating a summary of the findings," a "process [the panel concluded was] a far cry from the simple act of recording observable information—the type of regularly conducted activity envisioned by [the business records exception]"). Second, several of the records lay out lists of infractions, suggesting that they may be accusatory instruments of a kind not ordinarily considered trustworthy under 803(6). *See, e.g., Lewis v. Velez*, 149 F.R.D. 474, 485 (S.D.N.Y. 1993) (noting that a "Notice of Infraction [was] . . . an accusatory instrument and, as such, . . . embodie[d] charges leveled by officials" and did "not possess the inherent indicia of reliability upon which hearsay exceptions, including those set forth in Rule 803(6) and Rule 803(8), are bottomed").

Third, as Gross argues, evidence of collaboration between the Government and the NCUA may be relevant to the trustworthiness of the records, or to their admissibility as business records. *See* Gross. Opp. at 8. The Government rightly notes that "there is nothing improper about the Government sharing evidence obtained in a criminal investigation," Gov't Opp. at 7, and cites to *United States v. Copple*, 827 F.2d 1182 (8th Cir. 1987) for that proposition. But *Copple* rejected a challenge to the admissibility not of *reports* prepared by the FDIC under the business records rule, but of "the documentary evidence" on which the reports were based, determining that "[such evidence] was [not] obtained by FDIC and state banking authorities acting solely as information-gathering agencies for the FBI." *Id.* at 1189. The fact that such underlying evidence is admissible, however, does not indicate that factual findings *based on that admissible evidence* by a civil agency acting alongside the prosecution team may necessarily be admitted as business records. Even in perfectly constitutional parallel investigations, civil agencies may have the motivation to assist the Government in its criminal prosecution. *See, e.g.,*

27

*United States v. Stringer*, 535 F.3d 929, 934 (9th Cir. 2008) (noting, in the context of a parallel

investigation that the Court determined complied with the constitution, that "[t]he SEC offered to

conduct the interviews of defendants so as to create 'the best record possible' in support of [the

U.S. Attorney's Office's Case] against them, and the AUSA instructed the SEC Staff Attorney

on how best to do that"); *see also id.* ("The SEC facilitated the criminal investigation in a

number of ways."). Thus, even if NCUA agents are not themselves law enforcement, many of

the same concerns that bar admission of law enforcement reports in criminal cases may go to the

trustworthiness of evaluative reports by agencies that worked alongside the prosecution team.

*See United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976) ("In adopting this exception [under

Rule 803(8)(B)], Congress was concerned about prosecutors attempting to prove their cases in

chief simply by putting into evidence police officers' reports of their contemporaneous

observations of crime.").

  In any case, even were all of the records otherwise admissible as business records, the Court

disagrees with the Government's basic premise: that, as a matter of statutory interpretation,

evaluative reports may come in under Rule 803(6) when the preparer testifies.  A review of

Second Circuit precedent suggests otherwise.  In *Oates*, the Second Circuit held that it is

"manifest that it was the clear intention of Congress to make evaluative and law enforcement

reports absolutely inadmissible against defendants in criminal cases." 560 F.2d at 72.  It then

went on to note that "it must have been the unquestionable belief of Congress that the language

of FRE 803(8)(B) and (C) accomplished that very result," *id.*, and specifically held that an

evaluative report that could not come in under the public records exception in a criminal case

against the defendant could not then come in under Rule 803(6), *see id.* at 74; *see also id.* at 84

(after specifically addressing the business records rule, going on to hold, in sweeping terms, that

"in criminal cases reports of public agencies setting forth matters observed by police officers and other law enforcement personnel *and reports of public agencies setting forth factual findings resulting from investigations made pursuant to authority granted by law* cannot satisfy the standards of any hearsay exception if those reports are sought to be introduced against the accused" (emphasis added)).

In the years since *Oates*, the Second Circuit has criticized its breadth. *See United States v. Yakobov*, 712 F.2d 20, 26 n.6 (2d Cir. 1983) ("We note in passing that the broader implications of *Oates* have been strongly criticized."). It has also narrowed certain pronouncements in *Oates* in subsequent decisions. *See Rosa*, 11 F.3d at 332–33 (narrowing the meaning of "law enforcement" under then-Rule 803(8)(B) to permit admission of matters observed in an autopsy report by a medical examiner's office, but nevertheless explicitly holding that the district court properly excluded "factual conclusions drawn from those observations as *required* by Rule 803(8)(C)" (emphasis added)); *Yakobov,* 712 F.2d at 24–27 (regarding *Oates*' discussion of certain hearsay exceptions not at issue in that case—but *not* the business records rule, which *was* at issue—to be dicta; *see also id.* at 25 (noting that, in *Oates*, the panel "held . . . that the curtailments in Rule 803(8)(B) and (C) of admission of [evaluative] reports against a criminal defendant extended beyond Rule 803(8) itself and precluded admission under Rule 803(6) as well"). Further, the Second Circuit has affirmed, in corroboration of the Government's position here, that the *purpose* of Rule 803(8)'s restrictions are indeed to protect a defendant's Confrontation Clause rights. *See Pinto-Mejia*, 720 F.2d at 258 (noting that "the reason for Rule 803(8)'s nonauthorization of the use of investigative findings against defendants in criminal cases is to avoid abridgment of a defendant's Sixth Amendment right of confrontation" (citing

*Oates*, 560 F.2d at 69–84)).  But the Second Circuit has never repudiated the application of the *Oates* rule to Rule 803(6).

Nor has the Second Circuit held, as the Government argues here, that if the Government cures any Confrontation Clause problem, or the preparer of a report testifies, evaluative reports *may* be admitted under Rule 803(6).  Indeed, such a determination, which the Government supports with out-of-circuit precedent, *see Sokolow,* 91 F.3d at 396, is at odds with the actual holding of *Oates* itself.  The *Oates* panel did describe potential Confrontation Clause issues in that case, though the decision did not ultimately reach the constitutional issue.  *See Oates*, 560 F.2d at 80–84.  Nevertheless, *Oates'* holding was not *contingent* on the presence of these concerns.  The Second Circuit instead stated that such concerns "reinforce[d] [the panel's] belief that [they were] correct in holding [as a statutory matter] . . . that in criminal cases . . . reports of public agencies setting forth factual findings resulting from investigations made pursuant to authority granted by law cannot satisfy the standards of any hearsay exception if those reports are sought to be introduced against the accused." *Id.* at 83–84; *see also Oates*, 560 F.2d at 83 n.31 (noting that "the hearsay rule and the confrontation clause are independent of one another"); *Reardon v. Manson*, 644 F.2d 122, 127 n.10  (2d Cir. 1981) (affirming that *Oates*, "in construing Federal Rules of Evidence 803(6) took pains to 'stress, ... that [the panel did] not decide whether appellant's right to confrontation was violated,'" and made clear that the appeal "was decided on 'narrow statutory grounds'" (quoting *Oates*, 560 F.2d at 80)).  Moreover, *Oates*, in interpreting the statutory contours of the Federal Rules of Evidence, repeatedly noted that the implied exclusion that Rule 803(8) suggested in Rule 803(6) was *prophylactic*: it was not designed to operate only when there was, in fact, a Confrontation Clause problem, but "as a filter to screen out evidence which *might be suspect* in the event of a constitutional challenge on confrontation

30

grounds." *Id.* at 79 (emphasis added); *see also id.* at 66 (referring to the rules as "avert[ing] the *possibility* of conflict between the hearsay exceptions and the confrontation clause" (emphasis added)). In other words, the holding in *Oates* was based on a *statutory* reading of the rules, influenced by but not contingent upon constitutional concerns; and *Oates* made clear that the statutory logic of its decision was that the rules were prophylactic—designed to prevent not just the *eventuality,* but also the *possibility,* of a confrontation problem. Nothing in *Oates'* reasoning suggests, then, that it could be read as consistent with the implied exception the Government proffers here.[12]

Indeed, case law from other circuits, including *Sokolow,* the very case the Government cites, affirms the Court's understanding of the contours of Second Circuit law. In *Sokolow,* the Third Circuit made clear that many courts have criticized *Oates* "as an unduly broad interpretation of Rule 803(8)," and cited to precedent from the Seventh and Tenth Circuits for the proposition that "the *Oates* rule does not apply" if the author testifies. 91 F.3d at 405. In other words, *Sokolow* appeared to understand its holding as *departing* from the rule articulated in *Oates,* which binds *this* Court, not as consistent with it. Similarly, in *United States v. Metzger,* the Sixth Circuit, in adopting the rule the Government proffers, noted that the Seventh Circuit had departed from the *Oates* rule and, instead, adopted the "*better rule* in dealing with the admissibility of records under Rule 803(6); such records are admissible as long as the declarant testifies." 778 F.2d

---

[12] In *United States v. Feliz,* the Second Circuit observed that, in *Rosa,* the court affirmed the district court's redaction of factual findings from an autopsy report; *Feliz* went on to note, however, that "[i]t is not entirely clear . . . whether such factual conclusion must be redacted where the autopsy report is admitted as a business record under Rule 803(6)." 467 F.3d 227, 236 n.6 (2d Cir. 2006). The panel, however, noted that the issue was not before the court as the defendant had not contested, as a statutory matter, whether the reports at issue could come in as business records (and had made only a constitutional argument); further, the panel did not address *Oates. See id. Feliz* cannot be read, then, to sub silentio have overturned the statutory holding in *Oates* or to have codified the exception for which the Government now argues.

1195, 1201 (6th Cir. 1985) (emphasis added). In other words, the Sixth Circuit understood *Oates* itself to *not* support such a conclusion.

Further, it is not obvious that the underlying Confrontation Clause concerns supporting the *Oates* rule are, as a general matter, so easily satisfied merely through testimony of the preparer of an evaluative report, in most cases and in this case. First, such reports will often have relied on numerous sources, complicating the confrontation issues. Indeed, in this case the Government admits that the NCUA not only relied on a vast administrative record, but may also have relied in part on the Government's own publicly-filed charging documents in preparing the Confidential Statement of Grounds. *See* Oct. 24, 2016 Tr. at 29–30. Second, it may be that the preparer of a given record or report is not herself the decision-maker. Again, the NCUA records in this case indicate that "the [NCUA] Board," presumably made up of multiple decision-makers, collectively reached the resulting findings. *See* Order of Conservatorship at 52273; *cf. Abascal*, 820 F.3d at 565 (noting that, because a report was "officially authored by [an association]," "it [was] unclear from the record who, in fact, authored [it]" for purposes of determining, under Rule 803(6), whether the author had personal knowledge of the reported information). Third, factual findings communicate formal conclusions reached at a particular time; the preparer of the report, even if put on the stand, may not always remember the precise reasons through which she reached previously-recorded discretionary conclusions, yet the jury will still find out that such conclusions *were* reached at a prior date.

Indeed Gross, for these and other reasons, challenges the Government's representation that the confrontation problems present here could be or would be cured at trial were the Court to admit the NCUA documents for their truth. *See* Gross Sur-Reply at 3 n.2. However compelling such arguments, the Court need not ultimately reach the constitutional issue. Because the

records contain factual findings by the Government made pursuant to a legally authorized investigation, they are no more admissible under Rule 803(6) against Gross than under Rule 803(8).

### 2. The evaluative findings in the NCUA records are also inadmissible pursuant to Federal Rule of Evidence 403

Gross also argues that, even if the NCUA records could come in under Rule 803(8) or Rule 803(6) for their truth, they would nevertheless be inadmissible under Rule 403. Gross Opp. at 9–11. The Court agrees and concludes that the NCUA records are also inadmissible on this alternate ground. *See Paolitto*, 151 F.3d at 64 (holding that, even if hearsay evidence is admissible under a hearsay exception, a district court retains "discretion to exclude such hearsay on other grounds," including that "the evidence's probative value is substantially outweighed by the danger of unfair prejudice" (citing Fed. R. Evid. 403)).

First, the evaluative conclusions in the NCUA records are not highly probative. The Government seeks to introduce the NCUA records "to show how Gross operated HOPE FCU in an unsafe and unsound manner and in violation of his fiduciary duties," a showing which the Government argues "is highly probative of a key issue that will be before the jury: whether Gross acted with corrupt intent." Gov't Reply at 26. Yet, even if the question whether Gross breached his fiduciary duties is material to his culpability, the evaluative conclusions contained in the NCUA records are not themselves highly probative, as they are essentially cumulative. To take the Confidential Statement of Grounds as the prime example, in arguing that confrontation concerns need not result in exclusion of the statement, the Government represents that it "expects to call the HOPE FCU board members who were interviewed by the NCUA as witnesses at trial," as well as "introduce documentary evidence and other witness testimony that support the

NCUA's grounds for conservatorship set forth in the Confidential Statement." Gov't Reply at 19. Yet to the degree that the Government intends to introduce the evidence on which the NCUA *relied* in reaching its evaluative conclusions—in the Confidential Statement of Grounds and other NCUA records—it follows that the conclusions themselves are not highly probative: the jury will have before it evidence from which it may reach (or not reach) the same conclusions as the NCUA. *See United States v. Gupta*, 747 F.3d 111, 132 (2d Cir. 2014), *cert. denied,* 135 S. Ct. 1841 (2015) (affirming a district court's conclusion that evidence was "cumulative, given that the [district] court had . . . admitted other evidence to the same effect" (internal quotation marks omitted)); *Paolitto,* 151 F.3d at 65 (affirming a district court's decision to exclude a state employment discrimination report under Rule 403, in part because the party seeking admission "had a full opportunity to present to the jury all the evidence it had submitted to the [agency]").

On the other hand, the evidence is highly prejudicial. First, given that the underlying evidence on which the NCUA relied is likely to be admitted at trial, and that evaluative conclusions in the NCUA documents are either relevant to or specifically address ultimate issues of fact for the jury, the only effect of introducing such conclusions for their truth would be to place the NCUA's imprimatur on the Government's preferred interpretation of the evidence. Using the NCUA records in that manner would be highly prejudicial and pose a genuine threat of usurping the jury's role. *See Garcia*, 413 F.3d at 214–15 ("It is . . . the jury's singular responsibility to decide from the evidence admitted at trial whether the government has carried its burden of proof beyond a reasonable doubt."); *see also Hall v. W. Prod. Co.,* 988 F.2d 1050, 1058 (10th Cir. 1993) (affirming a district court's exclusion of an evaluative report under Rule 403 on the grounds that "the district court determined that all the evidentiary matter before the [agency] could be presented to the jury in some other form or fashion, and, therefore, the only

purpose to be served by admitting into evidence the [agency] report would be to suggest to the jury that it should reach the same conclusion as the [agency]" (internal quotation marks omitted)); *Denny v. Hutchinson Sales Corp.,* 649 F.2d 816, 822 (10th Cir. 1981) (affirming a trial court decision denying admission of an evaluative report on the same grounds). Indeed, the potential for such prejudice is particularly clear in the context of the Confidential Statement of Grounds. As Gross correctly argues, the document does little more than inform the jury that an independent governmental agency, reviewing the same evidence that the jury must review, has concluded that Gross is guilty of the charges in the Indictment. *Cf. Denny*, 649 F.2d at 822 (noting that "there is a real possibility that the jury would give undue deference to" the conclusions of an agency). Further, such prejudice is exacerbated here by the fact that, according to the Government, the NCUA may have relied on the Government's publicly-available charging instruments when drafting the Confidential Statement of Grounds. *See* Oct. 24, 2016 Tr. at 29–30. In other words, admission of the Confidential Statement of Grounds would not only allow the Government to place the NCUA's imprimatur on the factual conclusions it wants the jury to reach, but also put its own charging instruments before the jury in the guise of corroborating evidence from an independent governmental agency.

Finally, given the importance of the NCUA's factual findings to ultimate issues at trial, "admission of the report would [be] likely to protract an already prolonged trial with an inquiry into collateral issues regarding the accuracy of the report and the methods used in its compilation." *City of N.Y. v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981).

Even if otherwise admissible, then, the Court would still exclude the evaluative conclusions in the NCUA records pursuant to Rule 403.[13]

---

[13] Gross also makes additional arguments why the NCUA records are inadmissible. First, he argues that NCUA examiners constitute "law-enforcement personnel" under Rule 803(8)(A)(ii) such that, even if the records

## C. Conclusion

In conclusion, the Court denies the Government's motion to admit the NCUA records in

total, and grants Gross's motion to preclude admission of the factual findings in those records for

their truth.[14]

## II. Gross's motions to transfer and sever; Gross's second motion to preclude; and Lebedev's renewed motion to sever

The Court next addresses Gross's motions to sever, Dkt. No. 230, to preclude the

Government from introducing evidence or eliciting testimony referring to the payments allegedly

made to Gross by members of the Collectables Club as "bribes," Gross Motions in Limine at 4,

and to transfer the case against him to the District of New Jersey, Dkt. No. 197. In addition, the

Court here addresses Lebedev's renewed motion to sever. Dkt. No. 244. For the following

reasons, the motions are DENIED.[15]

--------

contain matters observed pursuant to a duty to report, they cannot come in as public records. *See* Gross Opp. at 4. Second, he argues that e-mails exchanged by certain agents at the NCUA in January 2015 demonstrate both that the NCUA was aware of the Government's criminal investigation at that time and was concerned that the investigation of the HOPE FCU could result in its liquidation, rendering the reports untrustworthy. Gross Sur-Reply at 2–3. Third, he argues that the fact that the NCUA was closely watching the HOPE FCU in September 2014 renders any documents it created insufficiently routine to come in as business records. *See id.* at 3–4. Additionally, Gross joins an argument initially made by Anthony Murgio that the NCUA documents are not admissible, as they constitute expert testimony under Federal Rule of Evidence 702 and/or summaries under Federal Rule of Evidence 1006, and that the Government has not met the necessary requirements to provide such material pursuant to either rule. *See* Dkt. No. 199 at 14–15. In light of the Court's determination that the evidence in question cannot, at least in its present form, be admitted, the Court does not reach these and other arguments made by Gross or the Government.

[14] The Government has not sought, in its various briefs, to admit any of the documents with factual findings or other prejudicial material redacted. *Cf. Rosa*, 11 F.3d, at 332–33. Nor has the Government argued that any of the records are admissible not for their truth, but for other purposes. *See Golod v. La Roche*, 964 F. Supp. 841, 855 (S.D.N.Y. 1997) (noting that certain "reports [were] not hearsay, because they [were] offered not" for their truth, but for another purpose). The Court does not address, at this time, whether any of the material could come in with certain material redacted, or for a non-hearsay purpose.

[15] The Court adopts the following labeling conventions for the parties' briefs addressing these motions. "Gross Motion to Sever" refers to Gross's memorandum of law in support of his motion to sever. *See* Dkt. No. 230. "Gross Motion to Transfer" refers to Gross's memorandum of law in support of his motion to transfer. *See* Dkt. No. 197. "Gov't Opp. to Motions to Sever and Transfer" refers to the Government's single brief opposing both motions. *See* Dkt. No. 253. "Gross Severance and Transfer Reply" refers to Gross's reply brief in further support of both

**A. Gross's motion to sever**

On September 30, 2016, Gross moved to sever his trial from that of his co-defendants

Anthony Murgio and Yuri Lebedev. As noted, Mr. Murgio has since pled guilty, but Mr.

Lebedev has not.

Gross is charged in a nine-count Indictment with one count of receiving corrupt payments as

an officer of a financial institution, the HOPE FCU, with the intent to be influenced, in violation

of 18 U.S.C. § 215(a).  S3 Indictment ¶¶ 22-23.  Lebedev is charged both with conspiracy to

make corrupt payments with the intent to influence an officer of a financial institution, namely

Gross, and with making those payments, in violation of 18 U.S.C. § 215(a).[16] *Id.* ¶¶ 16-21.  The

Government contends that Murgio, Lebedev, and others offered over $150,000 in bribes to Gross

for the purpose of acquiring control of the HOPE FCU, and that, in exchange for those bribes,

Gross helped them effectuate that plan in violation of his fiduciary duties.  *Id.* ¶ 10.  For the

reasons that follow, the motion to sever is denied.

Federal Rule of Criminal Procedure 14 permits a court to "sever the defendants' trials, or

provide any other relief that justice requires" if "consolidation for trial appears to prejudice a

defendant." Fed. R. Crim. P. 14(a).  As a general matter, "[t]here is a preference in the federal

system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S.

534, 537 (1993).  That preference is particularly strong where, as is the case here, "the

underlying crime involves a common plan or scheme." *United States v. Cardascia*, 951 F.2d

474, 482 (2d Cir. 1991).  Nevertheless, a court may grant a motion to sever pursuant to Rule

---

motions. *See* Dkt. No. 257. Finally, "Lebedev Motion to Sever" refers to Lebedev's letter in support of his renewed
motion to sever. *See* Dkt. No. 244. Naming conventions introduced in Part I remain in effect.

[16] The remaining six counts were alleged only against Anthony Murgio. *See generally* S3 Indictment.

14(a) if it concludes that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Courts in this district consider a number of factors in deciding whether to grant a severance, including: (1) "the number of defendants and the number of counts" in the indictment; (2) "the complexity of the indictment"; (3) "the estimated length of the trial"; (4) differences in the level of involvement of the various defendants "in the overall scheme"; (5) "possible conflict between various defense theories"; and (6) prejudice that would result from the introduction of evidence at trial that is "admissible as to some defendants, but not others." *United States v. Ramos*, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004). No one factor is dispositive, and the decision whether to grant a severance rests with the "discretion of the trial court." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003).

As an initial matter, Gross does not argue that this case involves an unusually large number of defendants, that the Indictment is particularly complex, or that the trial itself will be unusually long, *see generally* Gross Motion to Sever, and in any case, the Court previously rejected such contentions in denying Lebedev's first motion to sever—even prior to Anthony Murgio's guilty plea, *see* March 4, 2016 Tr. at 16 (Dkt. No. 72). Nor does Gross argue that that he and Lebedev will present mutually antagonistic defenses at trial. Gross's primary argument is, instead, that he will suffer spillover prejudice from the introduction of evidence against Lebedev that would not be admissible at a trial in which he was the sole defendant.

Gross argues, and the Government does not deny, that the Government intends to introduce written communications as well as testimony of Gross's co-defendants referring to payments made to Gross as "bribes." Gross Motion to Sever at 1; Gov't Opp. to Motions to Sever and

Transfer at 3.  Gross highlights, in particular, several e-mails exchanged among his co-defendants in which they speculate that Gross may have violated the law in accepting financial payments from businesses connected to Anthony Murgio, *see* Dkt. No. 230, Exs. 1–3, and in which they refer to payments to Gross as "bribe[s]," Dkt. No. 230, Ex. 2.  Gross argues that these statements would not be admissible against him in a trial in which he were the sole defendant, as they constitute inadmissible hearsay.  Gross Motion to Sever at 5.  He also argues that the statements are irrelevant to the charge against him.  As to this latter argument, Gross observes that case law requires, in the context of a bribery prosecution, that "the government . . . prove at trial that the payments were intended as bribes with respect to *each* defendant." *Id.* at 2 (emphasis added) (citing *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006)).  Even if these statements may help, then, to establish that Lebedev understood the relevant payments as bribes, Gross argues that they are not probative of Gross's intent in accepting money from the Collectables Club.  In addition to not being admissible against him, Gross argues that the statements would be extremely prejudicial to his rights if introduced against Lebedev at a joint trial: a jury, hearing Gross's co-defendants refer to the payments as bribes, might improperly rely on those representations in reaching conclusions as to *Gross's* intent.  This prejudice would be compounded as Gross would likely be unable to cross-examine Lebedev at a joint trial.  *See id.* at 6.

In response, the Government first disputes Gross's argument that the statements would be inadmissible against him at a separate trial, arguing that the statements were "made by [Gross's] coconspirator[s] during and in furtherance of [a] conspiracy."  Fed. R. Evid. 801(d)(2)(E); *see also* Gov't Opp. to Motions to Sever and Transfer at 3.  As the Government observes, Federal Rule of Evidence 801(d)(2)(E) "does not require that the conspiracy [for purposes of admitting

hearsay evidence pursuant to the rule] be one charged in the indictment." *United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993). Thus, to admit statements pursuant to the rule, the Government need only prove by a preponderance of the evidence at trial that "there was a conspiracy, [] that its members included the declarant and the party against whom the statement is offered, and [] that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (per curiam) (quoting *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012)). The Government argues that it will show at trial, by a preponderance of the evidence, the existence of two such uncharged conspiracies: first, a conspiracy among all of the defendants to pay Gross bribes in exchange for his assistance, *see United States v. Abbey*, 560 F.3d 513, 520 n.8 (6th Cir. 2009) (observing that "one can be convicted of conspiring to bribe themselves"), and, second, "a conspiracy involving Gross, his co-defendants, and other uncharged individuals corruptly to obstruct an examination by the [NCUA] of HOPE FCU, and to make material false statements to the NCUA," Gov't Opp. to Motions to Sever and Transfer at 4 (citations omitted). Further, the Government argues that, assuming the statements are admissible against Gross under Rule 801(d)(2)(E), it is immaterial whether his co-defendants testify, as admission of a statement pursuant to that hearsay exception cures any potential Confrontation Clause problem. *See DeVillio*, 983 F.2d at 1193–94.

Though the Government represents that it will establish the admissibility of these statements against Gross at trial, it does not ask the Court to rule on their admissibility at this time. *See* Gov't Opp. to Motions to Sever and Transfer at 5; *see also United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("Under the . . . rule [articulated in *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969)], statements proffered as coconspirator statements may be admitted in evidence on

a conditional basis, subject to the later submission of the necessary evidence of [the] four

prerequisites."). For purposes of Gross's motion to sever, then, the Court assumes that

documents and testimony referring to the payments made to Gross as "bribes" will be admissible

against Lebedev, that the Government will introduce such evidence at trial for the purpose of

proving the intent of Lebedev in offering Gross payments, and that the statements will be

*inadmissible* against Gross. Even assuming Gross to be correct on all of these counts, he has not

met the high threshold of demonstrating the necessity of severance.

Though it is axiomatic that "[e]ach defendant is entitled to have his case determined from

evidence as to his own acts, statements and conduct, and any other evidence in the case which

may be applicable to him," *United States v. Cervone*, 907 F.2d 332, 342 (2d Cir. 1990), the mere

potential of spillover prejudice does not automatically require a severance. As this Court

observed when denying Lebedev's first motion to sever, "[l]imiting instructions are the

'preferred device for curing any prejudicial spillover' when compared with the far more

'burdensome' and 'extreme' remedy of severance." March 4, 2016 Tr. at 15 (quoting *Ramos*,

346 F. Supp. 2d at 575). The Government, for its part, does not contest Gross's premise that the

intent of a receiver of a bribe must be proved separately from the intent of the payer; it simply

argues that limiting instructions and/or jury instructions can sufficiently educate the jury as to

this distinction. *See* Gov't Opp. at 14 (arguing that "[t]hrough [jury] instructions, the Court can

explain to the jury that it must consider Gross's intent in *receiving* the payments independently

of that of his co-defendants in *making* the payments . . . ."). Gross, in turn, offers no persuasive

reason why limiting instructions, or jury instructions, would not suffice to cure any potential

spillover prejudice. Nor does he point to any case law supporting such a proposition. Instead,

the primary case that Gross cites to demonstrate that evidence of a payer's intent must be

distinguished from evidence of a recipient's intent did not address the necessity of a severance, but merely held that certain jury instructions were inadequate, at a *joint* trial, to properly distinguish the intent of the payer from the receiver. *See Ford*, 435 F.3d at 213.

Further, severance in this case would not only be unnecessary to protect Gross's rights, but would also be highly inefficient. Gross focuses on the inflammatory nature of the word "bribe," as well as other specific elements of this case, to support his argument that "[t]he prejudice [from admission of the evidence at a joint trial] would be so great that it could not be cured by a jury instruction." Gross Motion to Sever at 6. But at bottom, his argument is essentially that, as the alleged *recipient* of a bribe, he will *necessarily* be prejudiced by evidence that establishes that the *payers* understood their payments as bribes. Were this position correct, it would have highly problematic implications for judicial and prosecutorial economy. The Government argues that, for reasons of judicial economy, "[i]t makes no sense to try the payers of a bribe separately from the recipient of that very bribe." Gov't Opp. to Motions to Sever and Transfer at 9. It further observes that, in this case, the Government will have to demonstrate at trial "how the bribery scheme was hatched, developed, and implemented jointly by Gross and his co-defendants," and that a severance would thus require duplicative introduction of a great deal of evidence in separate trials. *Id.* at 9. Gross unpersuasively downplays these efficiencies and further argues that, these efficiencies notwithstanding, "[h]e is not alleged to have had any knowledge of or involvement in the Bitcoin exchange scheme," thereby suggesting that extensive evidence may be introduced at trial that is relevant only to the charges against Lebedev. Gross Motion to Sever at 8. But even were that the case, the Second Circuit has emphasized that "a disproportionate introduction of evidence relating to joined defendants does not require a severance in every case." *Cardascia*, 951 F.2d at 483 (2d Cir. 1991). Regardless of the quantity of evidence that is

42

*not* relevant to the charge against Gross, it is beyond dispute that there is extensive overlap between the case against him and that against Lebedev. Of course, efficiency cannot justify abridging a defendant's right to a fair trial. However, in the absence of supporting precedent that a limiting instruction would be insufficient, and in light of clear evidence that such joint trials indeed occur, *see, e.g.*, *Ford* 435 F.3d, at 213, the Court is disinclined to adopt an argument with such a potentially negative impact on judicial economy.

The motion to sever is thus DENIED.

## B. Gross's motion to preclude the Government from referring to payments made to him as bribes

Gross moves, in the alternative, to preclude the Government, in a *joint* trial, from eliciting testimony or other evidence in which Gross's co-defendants refer to payments made to him as "bribes." *See* Gross Motions in Limine at 4. Gross's argument that the introduction of such testimony should be precluded in a joint trial mirrors his argument that the introduction of such evidence would require a severance: that the evidence is inadmissible as to him; that it is unduly prejudicial; and that such prejudice cannot be cured through a limiting instruction. *See id.* For the reasons that the Court provides above, *see supra* II.A, a limiting instruction will suffice to cure any prejudice flowing from such communications or testimony. The motion is thus DENIED.

## C. Gross's motion to transfer the case against him to the District of New Jersey

The Court next addresses Gross's motion to transfer the case against him from the Southern District of New York to the District of New Jersey. For the reasons that follow, that motion is DENIED.

Federal Rule of Criminal Procedure 21(b) permits the transfer of a proceeding "to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." The general rule, however, is that "a criminal prosecution should be retained in the original district." *United States v. Parrilla*, No. 13 CR 360 (AJN), 2014 WL 2200403, at *1 (S.D.N.Y. May 22, 2014) (quoting *United States v. United States Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964)). As such, a defendant "bear[s] the burden of justifying a transfer" under Rule 21(b). *Id.* (quoting *United States v. Riley*, 296 F.R.D. 272, 275 (S.D.N.Y. 2014)).

Under *Platt v. Minn. Mining & Manuf. Co.*, 376 U.S. 240 (1964), courts evaluating a motion to transfer may look to a non-exhaustive list of factors, including:

> (1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) *any other special elements which might affect the transfer.*

*Id.* at 243–44 (emphasis added). No single factor is dispositive, and "it remains for the court to try and strike a balance and determine which factors are of greatest importance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (internal quotation marks and alteration omitted).

As an initial matter, it is not obvious whether Gross's motion to transfer is derivative of his motion to sever—i.e., a "motion to transfer upon severance,"—or whether it is independent of that motion—i.e. "a motion to transfer *despite* severance." *Parilla*, 2014 WL 2200403, at *1 (internal quotation marks omitted) (emphasis added). To the extent that Gross argues merely that transfer is justified upon a finding that severance is required, such an argument is mooted by the Court's denial of Gross's motion to sever. The Court assumes, *arguendo*, that Gross has argued that transfer is justified *despite* the

fact that severance would be required.  Even if that is his argument, transfer is not justified here.

Gross argues that transfer of his case is necessary both for the convenience of the parties and in the interests of justice.  *See generally* Motion to Transfer.  As to the first prong, Gross argues that, because he resides in Jackson, New Jersey, "an hour and a half from the courthouse in the [Southern District of New York] . . . without traffic," and because many witnesses Gross anticipates calling reside in Jackson, the commute would be unduly burdensome upon him and those witnesses.  *Id.* at 3.  He also argues that holding a trial in the Southern District of New York could interfere with his ability to minister to his congregants in Jackson, and that many of the events material to the case against him, including the day-to-day operations of the HOPE FCU, occurred in the District of New Jersey.  *See id.* at 3–4.  As to the second prong, Gross argues that the Government's proffered evidence establishing venue in the Southern District of New York is "tenuous," and that transfer is thus necessary to preserve his Sixth Amendment right to be tried in the "district wherein the crime shall have been committed." *Id.* at 1, 4 (quoting U.S. Const. Am. VI).  For the following reasons, the Court finds that transfer is not justified.

First, as the Government points out, and as Gross acknowledges, transfer in this case would require a severance, a factor that strongly weighs against granting Gross's motion. Gov't Opp. to Motions to Sever and Transfer at 13; *see also* Gross Motion to Transfer at 2 (arguing that his case "can readily be severed from that of his co-defendants and transferred to the District of New Jersey").  If transfer of a case would require severance, such requirement serves as a "special element" favoring denial of the motion.  *Parilla,*

2014 WL 2200403, at *2; *see also United States v. Thomas*, No. 06 CR 365 (DLC), 2006

WL 2283772, at *2 (S.D.N.Y. Aug. 9, 2006) ("[S]evering the trial of properly joined

defendants without good reason is contrary to the interest of justice . . . ." (quoting *United*

*States v. Valdes*, No. 05-CR-156 (KMK), 2006 WL 738403, at *10 (S.D.N.Y. Mar. 21,

2006)); *Valdes*, 2006 WL 738403, at *10 ("[T]ransfer of a subset of defendants in a

multi-defendant case requires serious consideration of the Government's interest in

avoiding duplicate trials."); *United States v. Wheaton*, 463 F. Supp. 1073, 1079

(S.D.N.Y.1979), *aff'd sub nom. United States v. Williams*, 614 F.2d 1293 (2d Cir.1979)

(noting that transfer in a case where such transfer would require a severance imposes a

"double burden on the judiciary").  In denying Gross's motion to sever, the Court

explained that such severance was not justified, and would, furthermore, be inefficient,

burdening both the judiciary and the Government with duplicative trials.  *See supra* II.A.

Such burden is no more justified in the context of Gross's motion to sever as in his

motion to transfer, and strongly weighs against granting the motion.

   In contrast, the factors that Gross cites in favor of transfer are insufficient to tip the

balance.  *See Parilla*, 2014 WL 2200403, at *3 (holding that the defendant failed to meet

"his burden of justifying transfer, primarily because the need to sever his case and hold

two trials would impose additional expenses that outweigh his interest in a trial in the

district of his residence").  First, many of Gross's arguments, including the inconvenience

of having to commute to the Southern District of New York, the strain on his business,

and the inconvenience to his prospective witnesses, rely in part on the premise that it will

be difficult for various individuals to travel to this district for trial.  But as the

Government observes, the District of New Jersey is adjacent to the Southern District of

New York, greatly mitigating any burden associated with such travel. *See* Gov't Opp. to

Motions to Sever and Transfer at 14; *Thomas*, 2006 WL 2200403, at *2 (observing, in

response to a similar argument, that "[t]he District of Connecticut is contiguous with the

Southern District of New York, [that] there is a well-developed transportation network

that joins the communities where [the defendant] works and lives with this courthouse[,

and that] . . . [t]o the extent that [the defendant] can show that he is without funds to

attend trial in New York, that matter can be addressed through measures other than a

transfer").[17]

Second, to the degree that Gross seeks to argue, pre-trial, that venue is improperly laid in this

district, and that the Court thus must transfer the case to protect his Sixth Amendment rights, that

argument is foreclosed by this Court's September 19, 2016 Order. In that Order, the Court

denied Gross's motion for leave to seek pre-trial dismissal of the Indictment for lack of venue,

observing that "the arguments Gross advance[d] as to why the Government's venue proffer [was]

insufficient raise questions reserved for trial," and that "[a] pre-trial motion to dismiss the

Indictment for lack of venue would therefore be futile." *Id.* at 27. Gross has presented no reason

for the Court to reassess its earlier determination. As the Court previously affirmed in its

September 19, 2016 order, the Government will have to "'demonstrate the propriety of the

chosen venue by a preponderance of the evidence' at trial." *Id.* (quoting *United States v. Motz,*

---

[17] At oral argument on the instant motion, counsel for Gross appeared to suggest that the Government had argued that the proximity of the District of New Jersey to the Southern District is sufficient to establish venue in the latter. *See* Oct. 24, 2016 Tr. at 73, 78. The Government has not made that argument; it has, instead, argued that, for purposes of a motion to transfer, the proximity of the District of New Jersey to the Southern District of New York mitigates much of the inconvenience that travel to the latter district would impose upon Gross and his witnesses.

652 F. Supp. 2d 284, 290 (E.D.N.Y. 2009)).  This requirement, notwithstanding the denial of

Gross's motion to transfer, will be sufficient to protect Gross's Sixth Amendment rights.[18]

In short, primarily because "the need to sever [Gross's] case and hold two trials would

impose additional expenses that outweigh" any potential interest Gross has cited here in the

convenience of the parties or the interest of justice, Gross's motion for transfer is DENIED.

*Parilla*, 2014 WL 2200403, at *3.

### D. Lebedev's renewed motion to sever

In a letter to the Court filed on October 6, 2016, Lebedev renewed his previously-filed

motion for severance.  For the following reasons, that motion is DENIED.

On March 4, 2016, the Court denied Lebedev's first motion to sever his trial from that of his

co-defendants, or in the alternate, to sever the bribery counts from the other counts in the

Indictment.  *See* Mar. 4, 2016 Tr. at 10.  The Court subsequently denied Lebedev's renewal of

this motion in its September 19, 2016 order.  Sept. 19, 2016 Order at 32–33.  In his second

renewed motion for severance (made prior to either Anthony or Michael Murgio's guilty pleas),

Lebedev largely repeats arguments that the Court has now twice rejected: that extensive evidence

may be admitted against his co-defendants that would not be admissible against him, and that

introduction of this evidence will waste his time and may be prejudicial.  Lebedev Motion to

Sever at 1.  Even if the Court assumes that these arguments remain viable after the subsequent

guilty pleas, the Court has now twice held that much of the evidence Lebedev cites as irrelevant

---

[18] To the degree, in contrast, that Gross argues *not* that venue is improperly laid in the Southern District of New York, but simply that it would be *easier* for the Government to establish venue in the District of New Jersey, such argument is also insufficient to justify transfer. *See United States v. Conroy*, 77 Cr. 670 (CHT), 1977 U.S. Dist. LEXIS 12134, at *7 (S.D.N.Y. Dec. 29, 1977) (["T]he defendants do not argue that venue is improperly laid in this district on any of the counts of the indictment, nor could they do so.  Instead, they seek to invoke considerations of fairness, convenience and accessibility and assert that justice requires that venue should be laid in the 'home area' of the defendants.  The Court does not find that . . . transfer is advisable, let alone required.").

"is relevant to proving the counts that he *is* charged with in the Indictment," Sept. 19, 2016 Order

at 33, and that, even were the evidence inadmissible, prejudice may be addressed through a

limiting instruction, Mar. 4, 2016 Tr. at 15; *see also Cardascia*, 951 F.2d at 483 ("[A]

disproportionate introduction of evidence relating to joined defendants does not require a

severance in every case.").

The only new argument Lebedev advances in his renewed motion is that testimony of the

NCUA examiners and NCUA investigation documents, which the Government intends to

introduce against Gross, "will not likely involve Mr. Lebedev," Lebedev Motion to Sever at 1,

and that this purportedly inadmissible evidence (as to Lebedev) is "very prejudicial," Oct. 24,

2016 Tr., at 80. In response, the Government argues that, to the degree that this testimony and

documentary evidence is admissible against Gross, much of it will also be relevant to the crimes

for which Lebedev is charged, as "Lebedev was a handpicked board member of [HOPE FCU]

who served on the board of the credit union," and evidence detailing the investigation of the

HOPE FCU thus "goes to evidence of Mr. Lebedev's role in the bribery scheme." *Id.* at 81.

The Court has now addressed the admissibility of the proposed NCUA records. *See supra* I.

In any case, the Court agrees with the Government that if any of this evidence were admissible at

trial against Gross, it would likely also be admissible against Lebedev, if for no other reason than

to "enable the jury to understand the complete story of the crime[] charged." *Reifler*, 446 F.3d at

92. And even assuming, *arguendo*, that any admissible NCUA evidence is not relevant as to

Lebedev, Lebedev has presented the Court with no compelling argument why a limiting

instruction would not be sufficient to cure any potential spillover prejudice. The motion is thus

DENIED.

**III. Gross's motion to compel production of NCUA materials from the Government**

The Court last briefly addresses Gross's motion to compel discovery. Anthony Murgio initially moved for the Court to compel the Government to produce (i) "[a]ll [NCUA] materials, including all communications between (1) the prosecution team and (2) the NCUA (including its legal counsel), and the dates the government received them"; (ii) "[a]ll interview statements of Jose Freundt, as well as all other materials related to or obtained from him still in the government's possession, custody, or control that it has not already produced"; (iii) "[a]ll of the Federal Rule of Criminal Procedure 17 subpoenas the government has served in this case and related communications between the prosecution team and the subpoenaed third-parties (including their legal counsel)"; and (iv) "[t]he search warrant application, including affidavit in support, for co-defendant Michael Murgio's home." *See* Dkt. No. 200. In light of Murgio's guilty plea, the latter three requests are denied as moot. As to the first request, Gross indicates in his reply brief in further support of his motions in limine that he "also joins in the motion of defendant Anthony Murgio at Docket No. 200 [the motion to compel], and seeks the NCUA records pre-trial for the reasons set forth in that motion." Gross Reply at 12. It is not clear whether Gross, in referencing Murgio's motion, seeks to join the motion itself, or instead to incorporate Murgio's arguments into Gross's own motion seeking, instead, a Rule 17 subpoena to serve on the NCUA—a motion the Court has denied as moot. *See supra* note 5; *see also* Dkt. No. 224 (in which counsel for Gross represents that Gross "do[es] not take any position on the motion at Docket No. 200"). Further, the arguments in Murgio's motion are largely specific to him, rather than to Gross or the other defendants. In any case, the motion is DENIED. Should Gross seek the records initially sought by Murgio, he may file a motion to that effect with arguments specific to him on or before January 19, 2017.

## IV. Temporary sealing

On October 5, 2016, the Court granted the Government's request to file certain NCUA exhibits under seal. *See* Dkt. No. 234. In that Order, the Court observed that "[u]pon resolution of the Government's motion in limine regarding the exhibits' admissibility, the Court may revisit this sealing order." *Id.* On November 10, 2016, the Court similarly granted Gross's motion to file an exhibit containing determinations by the NCUA with redactions. *See* Dkt. No. 297. In light of the fact that the Court cites to, and quotes, sealed materials in this Opinion and Order, the Court hereby orders that this Order be filed under temporary seal. On or before January 20, 2016, both Gross and the Government are further ORDERED to submit a joint letter to the Court indicating whether they continue to seek to have the NCUA exhibits the Government has submitted remain under seal, and to have the exhibit in Gross's submission remain redacted on the docket, and justifying that request under *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006). *See also In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 494 n.14 (S.D.N.Y. 2013) (noting that the court's reliance in an opinion on a specific section of a contract meant that "the presumption of access outweigh[ed] the asserted interest in maintaining the confidentiality of [that] section."). The parties should also submit a joint letter, on or before January 20, 2017, indicating whether they seek any redactions to the Opinion and Order, and justifying those redactions under *Lugosch*. Additionally, should any other Defendant object to the continued sealing or redaction of any or all of the NCUA materials (or take the position that they should remain sealed), he should submit a letter on or before January 20, 2017, indicating as much.

This resolves docket numbers 190, 191, 196, 200, 202, 206, 228, 229, 231, and 244.

SO ORDERED.

Dated: January ____, 2017
    New York, New York

AL SON J. NATHAN
United States District Judge